IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | | |
|---|---|---|
| **BRADLEY NEIL HEDLUND,** | | |
| Plaintiff, | ‖ | **No. 13-CV-4058-DEO** |
| v. | ‖ | **ORDER ON MOTION FOR SUMMARY JUDGMENT** |
| **CHARLIE ZOOK MOTORS, INC.; BRUCE ZOOK; CHARLIE ZOOK; AND ED MCLARTY** | ‖ | |
| Defendants. | ‖ | |

———————————————

## I. INTRODUCTION

Currently before this Court is Defendant Charlie Zook Motors, Inc., Defendant Bruce Zook, Defendant Charlie Zook and Defendant Ed McLarty's Motion for Summary Judgment. Docket No. 17. In their Motion for Summary Judgment, the Defendants raise two arguments, arguing that the Plaintiff's claims should be dismissed. Because the Defendants filed a single brief, the Court will refer to the Defendants collectively as Charlie Zook Motors [hereinafter CZM].

The parties appeared for a hearing on June 13, 2014. After hearing the parties' arguments the Court took the issues under advisement and now enters the following:

## II.  FACTUAL HISTORY

The Plaintiff, Mr. Hedlund began working for Defendant Charlie Zook Motors as a parts manager in 2006.  The parties agree that as a parts manager, it was Mr. Hedlund's job to open the parts department when the business opened each day, sell parts, answer the telephone, phone customers, help technicians when they had questions about parts, wait on walk-in customers, order parts, ship parts, stock shelves and close the parts department at the end of the business day. Mr. Hedlund worked between 60 and 70 hours per week.

Mr. Hedlund has a history of diabetes.  In 2011, he began experiencing some acute symptoms.  On March 11, 2011, while at work, Mr. Hedlund's blood sugar plummeted.  As a result of the low blood sugar, Mr. Hedlund's heart stopped and he slipped into a coma, where he remained for seven days.

Mr. Hedlund was off from work for the next two months on medical leave.  There is no dispute that this time off was medically necessary nor any allegation that Mr. Hedlund abused the medical leave system.  Mr. Hedlund contends that while on medical leave, Marv Diamond, a co-worker, told him that if Mr. Hedlund did not return to work, he would lose his job because

the supervisors were looking to hire a replacement for him.[1]
On May 31, 2011, a doctor cleared Mr. Hedlund to return to
work.[2] Mr. Hedlund returned to the car dealership a few days
later. However, Mr. Hedlund claims that the Defendants had
already hired a replacement parts manager; and, when he
returned to work, they told Mr. Hedlund to train the new
employee.

The Defendants terminated Mr. Hedlund's employment on
June 15, 2011. The Defendants argue that they terminated Mr.
Hedlund's employment because Mr. Hedlund had persistent
problems dealing with customers. As stated in the Defendants'
Statement of Facts:

> Ed McLarty [Mr. Hedlund's supervisor]
> counseled plaintiff 3-4 times about his
> attitude toward customers before his
> discharge. They discussed McLarty's
> expectations before Hedlund returned from

---

[1] Mr. Hedlund also contends that while in the hospital,
he was assured that his job would be waiting for him when
returned from work.

[2] There is some dispute in the record regarding the date
the doctor's return to work note was signed. (Possibilities
include May 3, 2011, May 30, 2011, and May 31, 2011.) As is
often the case with medical records, the doctor's handwriting
on the note at issue is unique. However, the Court is
persuaded that, for the purposes of this Order, the note is
dated May 31, 2011.

> leave. When plaintiff returned from
> medical leave, McLarty was on vacation.
> When McLarty returned from vacation, the
> first thing he was confronted with – in his
> first hour back - were reports from Diane
> Newton, the Office Manager, and Dustin
> Craft, that Hedlund was making people mad
> again already. This was the last straw for
> McLarty. Having discussed this very issue
> with Hedlund just two weeks earlier, the
> decision was made to discharge plaintiff.

Docket No. 20, p. 6.

After losing his job, Mr. Hedlund applied for social security benefits. He alleged his disability onset date was March 11, 2011, the day his heart stopped while at work. During the pendency of his social security case, Mr. Hedlund made numerous statements purporting to show the extent of his disability.[3] See Docket No. 20, Att. 2, p. 4-26. Mr. Hedlund was also examined by medical professionals who determined that he suffered from a number of cognitive and mental issues, which were likely caused by the episode of March 11, 2011. On

---

[3] For example, Plaintiff has difficulty remembering, understanding and following instructions. His attention and concentration is poor. He would have great difficulty interacting with supervisors, co-workers and the public, because of his anxiety disorder. He would be unable to respond appropriately to changes in a work environment. He cannot handle stress. Docket No. 20, Att. 2, p. 24.

November 30, 2012, Mr. Hedlund began receiving Social Security disability benefits.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if the record shows "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P., Rule 56(c). A fact is *material* if it is necessary "to establish the existence of an element essential to [a] party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). There is a *genuine issue* as to a material fact if, based on the record before the court, a "rational trier of fact" could find for the non-moving party. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

When considering a motion for summary judgment, a "court must view the evidence in the light most favorable to the nonmoving party . . . ." <u>Hutson v. McDonnell Douglas Corp.</u>, 63 F.3d 771 (8th Cir. 1995). This requires a court to draw any reasonable inference from the underlying facts in favor of the nonmoving party and to refrain from weighing the evidence,

5

making credibility determinations, or attempting to discern the truth of any factual issue in a manner which favors the moving party unless there is no reasonable alternative. <u>See</u> <u>Matsushita</u>, 475 U.S. at 587; and <u>Morris v. City of</u> <u>Chillicothe</u>, 512 F.3d 1013, 1018 (8th Cir. 2008) (citing <u>Thomas v. Corwin</u>, 483 F.3d 516, 526-27 (8th Cir. 2007)).

Procedurally, the movant bears the initial burden "of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." <u>Hartnagel v. Norman</u>, 953 F.2d 394, 395 (8th Cir. 1992) (citing <u>Celotex</u>, 477 U.S. at 323). Once the movant has carried his burden, the non-moving party is required "to go beyond the pleadings" and through "affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(e)).

In times past, courts suggested that the standard for summary judgment in employment discrimination cases required a higher showing than in 'other' summary judgment cases. However, the 8th Circuit rejected that view, stating:

> summary judgment is not disfavored and is
> designed for 'every action,' panel
> statements to the contrary are unauthorized
> and should not be followed. There is no
> 'discrimination case exception' to the
> application of summary judgment, which is
> a useful pretrial tool to determine whether
> any case, including one alleging
> discrimination, merits a trial.

Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir.

2011). However, that is not to say that discrimination cases

do not present their own unique challenges. As Judge Bennett

of this Court recently observed:

> experience teaches that thoughtful
> deliberation of summary judgment in
> employment discrimination cases is grounded
> in the consideration of each case through
> a lens filtered by the following
> observations. Employment discrimination
> and retaliation, except in the rarest
> cases, are difficult to prove. They are
> perhaps more difficult to prove today-fifty
> years after the passage of the EPA, more
> than forty years after the passage of Title
> VII and the ADEA, more than twenty years
> after the passage of the ADA, and nearly
> two decades after the passage of the FMLA-
> than during the earlier evolution of these
> anti-discrimination and anti-retaliation
> statutes. Today's employers, even those
> with only a scintilla of sophistication,
> will neither admit discriminatory or
> retaliatory intent, nor leave a
> well-developed trail demonstrating it.
> See, e.g., Riordan v. Kempiners, 831 F.2d
> 690, 697-98 (7th Cir. 1987). Indeed, the
> Fifth Circuit Court of Appeals recognized

more than thirty-five years ago, that "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees."

Rogers v. EEOC, 454 F.2d 234, 239 (5th Cir. 1971) (later relied on by the Supreme Court in Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65-67 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII).  My experience suggests the truth of that observation.  Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination and retaliation cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge.  This is especially true, because the very best workers are seldom employment discrimination and retaliation plaintiffs due to sheer economics:  Because the economic costs to the employer for discrimination or retaliation are proportional to the caliber of the employee, discrimination or retaliation against the best employees is the least cost effective.  See, e.g., id. Rather, discrimination and retaliation plaintiffs tend to be those average or below-average workers-equally protected by Title VII, the ADA, the ADEA, the EPA, or the FMLA-for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. See, e.g., id.  On the other hand, it is also relatively easy for

> disgruntled former employees to claim a
> protected basis under federal and state
> anti-discrimination laws as a reason for
> their discharge when in fact they played no
> part. This is true even when the former
> employee and/or their counsel believe they
> did. This is what makes deciding these
> issues on a paper record daunting.

Pick v. City of Remsen, 2014 WL 4258738, 11-12 (N.D. Iowa 2014).

## IV. ISSUES

Defendant's Motion for Summary Judgment raises two main issues. Regarding Mr. Hedlund's disability claim, the Defendants argue that Mr. Hedlund is not a qualified individual with a disability because he cannot perform the essential function of the job of parts manager. Regarding Mr. Hedlund's Family Medical Leave Act claim, the Defendants argue that they had a legitimate, non-discriminatory reason for discharging Mr. Hedlund. The Court will address each issue in turn.

## V. ANALYSIS

### A. Disability Claim

The Americans with Disabilities Act (ADA), including changes made in the ADA Amendments Act of 2008 (ADAAA),

prohibits an employer from discriminating against a qualified employee on the basis of the employee's disability in regard to job application procedures, the hiring, advancement, or discharge of the employee compensation, job training, and other terms, conditions, and privileges of employment. 20 42 U.S.C. § 12112(a); <u>Tusing v. Des Moines Indep. Community Sch. Dist.</u>, 639 F.3d 507, 518 (8th Cir. 2011). Pursuant to the ADA, to establish a discrimination claim, an employee must show that he (1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) has suffered an adverse employment action because of [his] disability. <u>E.E.O.C. v. Prod. Fabricators, Inc.</u>, 2014 WL 3971477, 23 (8th Cir. 2014). "A 'qualified individual with a disability' is 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.' 42 U.S.C. § 12111(8)." <u>Young v. Warner-Jenkinson Co., Inc.</u>, 152 F.3d 1018, 1021 (8th Cir. 1998). When no direct evidence of discrimination is put forward, a discrimination claim is analyzed under the burden-shifting framework set forth in <u>McDonnell Douglas Corp.</u>

10

v. Green, 411 U.S. 792, 802-03 (1973) and its progeny.  Young,

152 F.3d at  1021.

        In his Complaint, Mr. Hedlund alleges:

                Defendants' actions, including terminating
                Plaintiff's employment because of his
                physical disabilities constituted illegal
                discrimination against a qualified
                individual with a disability, and
                therefore, violated Iowa Code Chapter 216
                and the Americans with Disabilities Act.

Docket No. 13, p. 4.  As stated above, there are three

elements to a prima facie ADA claim.[4]  Defendants concede that

Mr. Hedlund can show the first element of his ADA claim, that

he has a disability.  The Defendants also concede the third

element of the claim, that Mr. Hedlund suffered an adverse

employment action-they fired him.  However, the Defendants

argue that Mr. Hedlund cannot prove the second element,

stating:

_____

        [4]  The Court notes Mr. Hedlund brought his disability
claim under both the Federal statute, the ADA, and Iowa's
version of the statute, ICRA.  However, numerous courts have
recognized that the analysis for both the federal and state
statutes is the same.  See, for example, Tjernagel v. Gates
Corp., 533 F.3d 666, 671 (8th Cir. 2008).  Accordingly, the
Courts' analysis encompasses both statutes.

> plaintiff cannot prevail, because he cannot
> demonstrate that he was qualified to
> perform the essential functions of his job
> at Zook Motors, with or without reasonable
> accommodation, at any time after March 11,
> 2011, the day on which he had his heart
> attack.

Docket No. 20, Att. 1, p. 4.

Essential functions are "'the fundamental job duties of the employment position the individual with a disability holds.' 29 C.F.R. § 1630.2(n)(1). Evidence to consider in this determination may include: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs." Knutson v. Schwan's Home Serv., Inc., 711 F.3d 911, 914 (8th Cir. 2013) citing Kammueller v. Loomis, Fargo & Co., 383 F.3d 779, 786 (8th Cir. 2004); see generally 29 C.F.R. § 1630.2(n)(3). The employer's judgment about an essential job function is considered highly probative. Knutson, 711 F.3d. at 914.

12

The Defendants' argument-in a nut shell-is that because of Mr. Hedlund's disability, as evidenced by his application for and receipt of Social Security disability benefits, he was no longer qualified to perform the essential functions of his job after the incident of March 11, 2011. The Plaintiff responds to that argument by pointing out that "claims for Social Security Disability Insurance benefits and claims for ADA damages do not inherently conflict." Docket No. 25, Att. 4, p. 3. The Plaintiff correctly points out (and the Defendants agree) that the United States Supreme Court has allowed social security claimants to pursue both disability claims and ADA claims at the same time, as a finding of disability by the Social Security Administration does not automatically mean that someone like Mr. Hedlund could not perform the essential functions of his job at Charlie Zook Motors. <u>Cleveland v. Policy Management Systems, Corp.</u>, 526 U.S. 795, 119 S. Ct. 1597 (1999). However, the same Court stated:

> [a]n ADA plaintiff bears the burden of proving that she is a "qualified individual with a disability"—that is, a person "who, with or without reasonable accommodation, can perform the essential functions" of her job. 42 U.S.C. § 12111(8). And a

> plaintiff's sworn assertion in an
> application for disability benefits that
> she is, for example, "unable to work" will
> appear to negate an essential element of
> her ADA case—at least if she does not offer
> a sufficient explanation. For that reason,
> we hold that an ADA plaintiff cannot simply
> ignore the apparent contradiction that
> arises out of the earlier SSDI total
> disability claim. Rather, she must proffer
> a sufficient explanation.

Cleveland, 526 U.S. at 806.

The Defendants argue that after the episode on March 11, 2011, Mr. Hedlund could not do his job. As agreed by the parties, his duties included opening his department each day, selling parts, answering the telephone, phoning customers, helping technicians when they had questions about parts, waiting on walk-in customers, ordering parts, shipping parts, stocking shelves, and closing the parts department at the end of the business day. The Defendants point to facts from the Social Security file that show that Mr. Hedlund could no longer perform his job. Specifically, Dr. Marandola concluded that Mr. Hedlund would have problems remembering and understanding instructions, could not carry out complex instructions, would have problems with attention and concentration, and, most importantly, would have a "great deal

14

of difficulty" interacting with his supervisors and members of the public. Docket No. 20, Att. 2, p. 15-16. Based on the statements and medical records from the social security file, it seems unlikely, if not impossible, that Mr. Hedlund could return to his old job. His job requirements were technical and required him to interact both with co-workers and customers. Neither are things that Mr. Hedlund could do if his Social Security file is to be believed.

As stated above, it is the Plaintiff's obligation to both show that he can do the job in question, and, in a case such as this, explain away the discrepancies between his application for Social Security disability and his ADA claim. In this case, the Plaintiff has done neither. As stated in the Defendants' brief, Mr. Hedlund's only argument is that if the Defendants had made accommodations, he may have been able to return to his old job. However, that unsupported allegation, is not enough to create a genuine issue of material fact regarding this ADA claim. As stated in the Defendants' reply brief:

> plaintiff represented to the Social Security Administration that he was unable to work, and that the date his disability began was March 11, 2011, the day his heart stopped at work. (Social Security File, p. 382 – Defendants' App. p. 17). Rather than proffer a sufficient explanation, as plaintiff is entitled to do under the holding in <u>Cleveland</u>, plaintiff has chosen to ignore this opportunity, and focus solely on the allegation that had he been accommodated by Defendants, he could have continued working. This is not an explanation for his inconsistent claims, it is an argument.

Docket No. 27, p. 1.

Because Mr. Hedlund has failed to show that he could perform the essential functions of a parts manager (especially considering he failed to explain how he could be a parts manager in spite of his Social Security disability), Mr. Hedlund has failed to create a genuine issue of fact regarding the second element of a prima facie ADA claim. Accordingly, his ADA claim fails as a matter of law and the Defendants' Motion for Summary Judgment must be granted. See also <u>Magnussen v. Casey's Mktg. Co.</u>, 787 F. Supp. 2d 929, 950 (N.D. Iowa 2011), where Judge Bennett reaches a similar conclusion where an ADA claimant filed for Social Security disability.

## B. Family Medical Leave Act

The Court now turns to Mr. Hedlund's claim under the Family Medical Leave Act (FMLA). 29 U.S.C. § 2615(a)(1) provides: "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." This provision of the Family Medical Leave Act has been interpreted to prohibit retaliation for having exercised one's rights under the Act. See <u>Lovland v. Employers Mut. Cas. Co.</u>, 674 F.3d 806, 810 (8th Cir. 2012) cert. denied, 133 S. Ct. 345, 184 L. Ed. 2d 158 (U.S. 2012).

In this case, Mr. Hedlund took FMLA leave after the episode of March 11, 2011. He was fired shortly after returning to work in June of 2011. Mr. Hedlund alleges that the Defendants fired him in retaliation for taking FMLA leave.

Mr. Hedlund admits there is no direct evidence of retaliation. Accordingly, this is a 'burden shifting' case. "Absent direct evidence... FMLA retaliation claims are evaluated under the <u>McDonnell Douglas</u> burden-shifting framework. <u>Wierman v. Casey's General Stores</u>, 638 F.3d 984, 999 (8th Cir. 2011)... To establish a prima facie case [the

17

plaintiff] must show that 1) he engaged in protected conduct; 2) he suffered a materially adverse employment action; and 3) the materially adverse action was causally linked to the protected conduct...  If [the plaintiff] establishes a prima facie case, the burden shifts to [the employer] to "promulgate a non- discriminatory, legitimate justification for its conduct," and then back to [the employee] to "either introduce evidence to rebut the employer's justification as a pretext for discrimination, or introduce additional evidence proving actual discrimination." Johnson v. Dollar Gen., 880 F. Supp. 2d 967, 990 (N.D. Iowa 2012) aff'd, 508 F. App'x 587 (8th Cir. 2013) (some internal citations omitted).

Many of the facts and allegations regarding this claim are admitted.  There is no dispute Mr. Hedlund engaged in protected conduct.  He took nearly two months of medical leave.  There is no dispute that he suffered an adverse consequence.  He was fired.  But, the Defendants contend that Plaintiff cannot prove the third element, that the adverse action was causally linked to the protected conduct.  However, based on the fact that Mr. Hedlund was fired a few days after engaging in the protected activity, and there is an allegation

that the Defendants set about replacing him even before he returned to work, Mr. Hedlund has sufficiently alleged a causal connection to shift the burden to the Defendants.

The Defendants, of course, argue that they had a legitimate non-discriminatory reason for discharge. As set out in their brief:

> Plaintiff was fired for continued mistreatment of customers. McLarty informed him of his decision in person. Hedlund was rude to personnel in the other departments at Zook. He was rude to wholesalers who bought parts at Zook; he was rude to independent repair shop personnel and he was rude to customers in general. Dustin Craft, the Body Shop Foreman at Zook, learned while attending a local meeting of the Siouxland Auto Repair Association, that this problem was serious enough that most people preferred not to do business with Zook. Bort Auto Body and Brouillette Body Shop both expressed similar concerns, directly to Zook. (Affidavits of Bradley Curtin, Barry Kounkel, Susan Rudnick, Dustin Craft and Scott Brouillette – App. pp. 30-37). Ed McLarty counseled plaintiff 3-4 times about his attitude toward customers before his discharge. They discussed McLarty's expectations before Hedlund returned from leave. When plaintiff returned from medical leave, McLarty was on vacation. When McLarty returned from vacation, the first thing he was confronted with – in his first hour back - were reports from Diane Newton, the Office Manager, and Dustin Craft, that Hedlund was making people mad

19

> again already. This was the last straw for
> McLarty. Having discussed this very issue
> with Hedlund just two weeks earlier, the
> decision was made to discharge plaintiff.
> (Affidavit of Ed McLarty – App. pp. 38-40).
> A supervisor's belief that an employee
> behaved rudely is a legitimate,
> non-discriminatory reason for disciplinary
> action.

Docket No. 20, Att. 1, p. 13. The Defendants' allegation that

they terminated Mr. Hedlund because he was rude is supported

by evidence in their appendix. See the affidavits referenced

above, Docket No. 20, Att. 2, p. 30-44.

Based on that, the burden shifts back to Mr. Hedlund to

rebut the Defendants' allegedly non-discriminatory reason for

discharge. Mr. Hedlund argues:

> based on the disputed facts, a reasonable
> fact a finder could conclude that
> Defendants' proffered reason is untrue. As
> noted above, at the summary judgment stage,
> the Court must consider Hedlund's version
> of events to be true. As set forth in
> Plaintiff's Statement of Additional Facts,
> Hedlund has testified that he was never
> disciplined prior to termination, Ed
> Mc[L]arty never warned him about his
> behavior, and the testimony of the others
> about his alleged rude behavior is untrue.
> Moreover, while Hedlund was in the
> hospital, Bruce Zook told Randy Meyer and
> others that Hedlund still had a job at Zook
> Motors. That statement by Zook is clearly
> inconsistent with terminating him right
> after his return. Moreover, it should be

> noted that Hedlund testified that McClarty
> told him that it was Bruce Zook's idea to
> terminate him, whereas Defendants' evidence
> makes it appear that McClarty made the
> decision – this is another discrepancy in
> the facts that prevents summary judgment.
> When a plaintiff introduces evidence that
> discredits the employer's proffered
> nondiscriminatory reason for the adverse
> employment action, a genuine issue of
> material fact is created with regard to the
> issue of pretext...

Docket No. 25, Att. 4, p. 6-7.

The Court is persuaded that Mr. Hedlund has alleged sufficient facts such that the question of whether his discharge was pretextual should be presented to the jury. First, there is the close temporal proximity between the firing and using the FMLA leave. As both parties agree, timing alone is not enough to sustain a retaliation claim. However, in this case, the close timing is not alone. There is also the allegation that the Defendants hired and were training a replacement employee even before Mr. Hedlund returned to work or committed the allegedly non-pretextual conduct that got him fired. Also, there are the inconsistencies, cited above, about who made the decision to fire Mr. Hedlund. There is also the allegation that he had never been warned about his 'rude' demeanor. Finally, Mr.

Hedlund contends that Mr. McLarty was also rude to customers and was never fired or reprimanded. This is another factual disparity that is better addressed to a jury than to a judge. Accordingly, the Plaintiff has alleged a genuine issue regarding his FMLA retaliation claim; and the Defendants' Motion for Summary Judgment regarding that claim must be denied.

## VI. CONCLUSION

For the reasons set out above, the Defendant's Motion for Summary Judgment, Docket No. 17, is **granted in part denied in part**. The motion is granted regarding Mr. Hedlund's ADA claim, but it is denied regarding his FMLA claim.

**IT IS SO ORDERED** this 25th day of September, 2014.

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa